**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

HUMAN RIGHTS DEFENSE CENTER,

Plaintiff,

v.

PAUL SCHNELL, *individually and in his official capacity as Commissioner of the Minnesota Department of Corrections*;

SAFIA KHAN, *individually and in her official capacity as Deputy Commissioner of the Minnesota Department of Corrections*;

KRISTIN RISH*, individually and in her official capacity as Warden of MCF Moose Lake*;

KATHY HALVORSON, *individually and in her official capacity as Warden of MCF Shakopee*;

JESSE PUGH, *individually and in his official capacity as Warden of MCF Saint Cloud*;

JOHN AND JANE DOES 1-20*, individually and in their official capacities*,

Defendants.

Civil No. 26-73 (JRT/ECW)

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

---

Matthew K. Gillespie, Anna Ashley, and Alex P. Hontos, **DORSEY & WHITNEY LLP**, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402; and Jonathan P. Picard, Human Rights Defense Center, Post Office Box 1151, Lake Worth, FL 33460, for Plaintiff.

Edwin W. Stockmeyer, III, and Bradley Simon, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suite 600, St. Paul, MN 55101, for named Defendants.

Plaintiff Human Rights Defense Center ("HRDC") brought an action against several Minnesota Department of Corrections ("DOC") officials (collectively, Defendants), alleging that the DOC's rules about who can send books to incarcerated people violate the First and Fourteenth Amendment rights of HRDC and of people in the custody of the DOC. HRDC now moves for a preliminary injunction enjoining Defendants from disapproving publications published or distributed by HRDC on the ground that HRDC is not an "approved" vendor under the DOC's current policies. HRDC further asks the Court to require Defendants to advise HRDC of the grounds for any disapproval, rejection, or refusal to deliver publications published or distributed by HRDC and to require Defendants to advise all DOC employees of the terms of the preliminary injunction. In their motion papers, HRDC only requested relief on its own behalf, but during oral argument, HRDC made it clear that it was challenging the policies not just as applied to HRDC but more broadly.

The Court will grant in part HRDC's motion. Because the Court concludes that the DOC's policy as currently implemented is not necessarily content neutral, the Court will order Defendants to issue a modified vendor application form and to develop and share guidelines indicating how vendors are reviewed. If HRDC wishes to distribute its publications to people incarcerated by the DOC, it will need to submit a complete

modified vendor application form, consistent with DOC's modified process. If the DOC denies HRDC's application (or any other vendor's application), Defendants will be required to advise HRDC (or the relevant vendor) of the grounds for any such disapproval.

## BACKGROUND

### I. FACTS

HRDC is a non-profit charitable organization. (First Decl. of Paul Wright ("First Wright Decl.") ¶ 2, Apr. 21, 2026, Docket No. 23.)[1] HRDC seeks "to educate prisoners and the public about the destructive nature of racism, sexism, and the economic and social costs of prisons to society." (*Id.*) "HRDC accomplishes its mission through advocacy, litigation, and publication and/or distribution of books, magazines, and other information concerning prisons and the rights of prisoners." (*Id.* ¶ 3.)

HRDC publishes and/or distributes several different books on criminal justice, health, and legal issues including:

- *Prisoners' Guerilla Handbook: A Guide to Correspondence Programs in the United States and Canada* ("Prisoners' Handbook"), which provides information on enrolling at accredited higher education, vocational, and training schools.
- *Prison Education Guide*, which provides a comprehensive listing of correspondence programs available to prisoners including a detailed analysis of the quality and cost of each program.

[1] Paul Wright is the Executive Director of HRDC. (First Wright Decl. ¶ 2.)

- *The Habeas Citebook: Ineffective Assistance of Counsel* ("Habeas Citebook"), which provides guidance for incarcerated persons seeking habeas relief.
- *Protecting Your Health and Safety* ("PYHS"), which describes the rights, protections, and legal remedies available to persons concerning their health and safety while they are incarcerated.

(*Id*. ¶ 8.)

### A. Mail Policy

In October 2024, the DOC revised its procedures related to book vendors. (*Id.* ¶ 16; Decl. of Ashlee Berts ("Berts Decl.") ¶ 18, May 12, 2026, Docket No. 32.) The DOC changed its policy so that incarcerated individuals could obtain books only from vendors on an "approved vendor list." (First Wright Decl. ¶ 16; Berts Decl. ¶ 18.)

The DOC's revised policy stated:

> **Books** must be purchased from approved vendors and shipped directly from the publisher directly to the facility. Books should be sent to the facility address . . . . As of October 21, 2024, only Hamilton Books, Harper Collins, and Penguin Random House are approved. Books ordered from unapproved vendors will be returned or disposed of according to DOC policy.

(First Wright Decl. ¶ 16, Ex. A. (providing information "as it appeared on [the DOC's] public website on November 5, 2024"); *see also* Decl. of Crystal Brakke ("Brakke Decl.") ¶ 10, Ex. D, May 12, 2026, Docket No. 35 (providing a copy of a memo issued to all DOC Facility Staff dated October 11, 2026, which sets forth the list of approved books vendors and states that "[b]ooks must be purchased from one of the three approved vendors . . . .")).

According to the DOC, these three vendors "had been vetted and confirmed by the DOC to be legitimate, and the DOC could verify [that they] would not send books that had been altered to hide drugs." (Berts Decl. ¶ 18.)

On November 8, 2024, HRDC sent a letter to the DOC requesting that the DOC rescind the new policy because it violated HRDC's First and Fourteenth Amendment Rights. (First Wright Decl. ¶ 17, Ex. B.) The DOC did not respond to HRDC's letter. (*Id.* ¶ 18.) The DOC claims that this letter was HRDC's "sole alleged attempt to communicate with DOC about DOC's mailing rules." (Mem. in Opp'n at 13, May, 12, 2026, Docket No. 30.)

On November 25, 2024, the DOC released a memo indicating it had "expand[ed] its list of approved book vendors for incarcerated individuals" to also include Macmillan, Simon & Schuster, and Hachette Book Group. (Brakke Decl. ¶ 11, Ex. E.)

In March 2025, the DOC again updated its approved book vendor list, removing Macmillan and adding five non-profit organizations. (*See id.* ¶ 22, Ex. G.) Defendants represent that "Mac[m]illan was eliminated from the prior list of approved vendors because DOC discovered that it used third-party fulfillment services, rather than direct order fulfillment." (*Id.* ¶ 21.) The DOC posted these updates and additional rules in a memorandum sent on March 20, 2025. (*Id.* ¶ 22, Ex. G ("Book Vendor Updates Memo").) The Book Vendor Updates Memo further provided that "[a]ny additional nonprofits

wishing to donate books to incarcerated individuals will be reviewed by the Deputy Assistant Commissioner of Teaching and Learning." (*Id.*)

That same day, the DOC posted a new policy governing publications sent to its facilities. (*See* First Wright Decl. ¶ 19, Ex. C ("Publication Policy"). The current version of the policy ("2026 Publication Policy") is available online.[2] Both the Publication Policy and the 2026 Publication Policy state:

> **Books** are allowed from approved vendors and nonprofit organizations and must be shipped directly from them to the facility. Books ordered from unapproved vendors or nonprofit organizations will be returned or disposed of according to DOC policy. Books should be sent to the facility address . . . .

(Publication Policy at 1–2; *see also* 2026 Publication Policy.) The Publication Policy further listed the approved publishers and nonprofit organizations. (Publication Policy at 2.)

HRDC alleges that the DOC's policies "provided no mechanism for publishers like HRDC to obtain 'approved vendor status.'" (Mem. in Supp. at 13, Apr. 21, 2026, Docket No. 22.) Instead, HRDC noted that the Book Vendor Updates Memo provided that any other "nonprofits wishing to donate books to incarcerated individuals will be reviewed by the Deputy Assistant Commissioner of Teaching and Learning." (*Id.* (quoting Book Vendor Updates Memo).)

Defendants explain that after posting the Book Vendor Updates Memo, they received several requests from outside vendors seeking to be added to the approved list

---

[2] https://perma.cc/78JE-6WF2

and so "began developing a process to consider those requests." (Berts Decl. ¶ 20.) "Eventually, the DOC developed a short application form that interested book vendors could fill out and submit to the DOC to become approved vendors." (*Id.*) That form ("Vendor Application Form") was then posted on the DOC's website. (*See id.*; *see also* https://perma.cc/VKN4-S4HP.) According to HRDC, the Vendor Application Form was not posted until February 2026. (First Wright Decl. ¶ 22, Ex. F.)[3]

The Vendor Application Form requires the applying organization to indicate if it "provide[s] books or other material to other correctional facilities" and if so, to list those facilities. (*Id.*) It also requires an applying organization to indicate if the "organization [has] ever been denied permission to mail books or other material to a correctional facility, had permission revoked, or otherwise been removed from a correctional facility's list of authorized vendors" and to "provide full details, including contact information for those facilities." (*Id.*) The form further states that "[r]equests will be reviewed on a quarterly basis by Minnesota Department of Corrections staff." (*Id.*) The policy does not provide a way for incarcerated individuals to obtain books from non-approved vendors nor does it appear that there is a way for incarcerated individuals to suggest that a vendor be added to the approved vendor list.

[3] A copy of the Vendor Application Form is attached as Exhibit F to the First Wright Declaration.

HRDC has not submitted an application form to become an approved vendor. (*See, e.g.*, Berts Decl. ¶ 24.)

The DOC reports that the changes it "has made to its mail policies and book vendor procedures have drastically reduced the amount of drugs that are being smuggled into DOC facilities" and have resulted in a "significant reduction in drug-related incidents including staff assaults and overdoses . . . ." (*Id.* ¶ 25.)

**B. HRDC's Mail to DOC Prisoners**

Between May 2025 and November 2025—after the DOC published its Book Vendor Updates Memo and Publication Policy on March 20, 2025—HRDC sent books and other materials (i.e., magazines, informational brochures, and correspondence) to individuals confined at DOC facilities. (First Wright Decl. ¶ 21.) HRDC reports that 53 of those items were returned to it by the DOC even though those individuals were still in the custody of the DOC, including copies of *PYHS*, copies of the *Prisoners' Handbook*, copies of the *Habeas Citebook*, and copies of the *Prison Education Guide*. (*Id.* ¶¶ 21, 23.) Some but not all of the items that were returned were marked "Unauthorized Vendor." (*Id.* ¶ 24.) HRDC claims that at least 59 additional books were delivered but were not returned. (*Id.* ¶ 25.) HRDC alleges that "Defendants failed to provide HRDC with notice that the items mailed by HRDC to prisoners at MNDOC facilities were being censored and returned at

HRDC's expense." (*Id.*)[4] HRDC further alleges that Defendants "failed to provide HRDC with an opportunity to appeal these censorship decisions before the items were rejected and returned to HRDC." (*Id.* ¶ 26.)

**C. Additional Access to Books at DOC Facilities**

The DOC noted that its incarcerated population has access to books through several other means, in addition to the mail.

First, the DOC highlights its library system. Each DOC facility has its own library and the majority of the staff hold degrees in library science. (Decl. of Andrea Smith ("Smith Decl.") ¶ 4, May 12, 2026, Docket No. 36.)[5] The DOC maintains "a collection of legal materials, referred to as the Core Collection, in each adult institution with the exceptions of the boot camp facilities[.]" (*Id.* ¶ 7.) The Core Collection is the same at each DOC facility . . . and includes . . . [HRDC's publication] *Protecting Your Health and Safety*[.]" (*Id.*) "Resources from the Core Collection cannot be checked out, but incarcerated individuals can receive photocopies of them in compliance with policy and copyright law." (*Id.*) Material that is not available at a given DOC facility's library can often be obtained through interlibrary loan. (*Id.* ¶ 8.) Some facilities accept donated materials, but it is

---

[4] The First Wright Declaration includes two paragraphs that are both designated as paragraph 25.

[5] Andrea Smith works for the DOC as the Senior Librarian at the Minnesota Correctional Facility at Shakopee and has worked for the DOC since 2005. (Smith Decl. ¶ 1.)

space dependent. (*See id.* ¶ 11 (noting that the Shakopee facility is not currently accepting donations but the St. Cloud facility regularly accepts donations).)

The DOC also highlights the Law Library Service for Prisoners (LLSP). (*See id.* ¶ 10.) "Through LLSP, three librarians at the [Minnesota] State Law Library are available to answer legal research questions they receive from incarcerated people through kites, phone calls, or virtual chats. Their assistance includes providing incarcerated people with photocopies of some legal materials available at the State Law Library." (*Id.*) "LLSP limits responses to 80 pages, or 8 items, per 2-week period." (Decl. of Ed Stockmeyer ¶ 5, Ex. B (Annual Report prepared by the Minnesota State Law Library concerning LLSP), May 12, 2026, Docket No. 37.)

## II. PROCEDURAL HISTORY

On January 7, 2026, HRDC filed its complaint. (Docket No. 3.) On April 21, 2026, HRDC moved for a preliminary injunction. (Docket No. 21.) On April 24, 2026, the Court set a briefing schedule: Responses due by May 12, 2026; Replies due by May 21, 2026. The parties timely filed their briefs. A hearing was held on June 5, 2026.

# DISCUSSION

## I. STANDARD OF REVIEW

The purpose of preliminary injunctive relief is to maintain the status quo. *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 664 (8th Cir. 2022). The Court considers four factors for a preliminary injunction motion: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance

between that harm and the harm injunctive relief would cause to the other litigants; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).

No one factor is determinative, and the court should "weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999) (quotation omitted). "However, in deciding whether to grant a preliminary injunction, likelihood of success on the merits is most significant." *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021) (cleaned up). "Generally, if a party shows a 'likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are . . . deemed to have been satisfied.'" *Rodgers v. Bryant*, 942 F.3d 451, 456 (8th Cir. 2019) (quoting *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (en banc)). The moving party bears the burden to establish that these factors weigh in favor of granting temporary relief. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

"[I]n the prison context, a request for injunctive relief must always be viewed with great caution because judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration." *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995) (internal quotation marks omitted).

## II. ANALYSIS

For HRDC to show it is likely to succeed on its claims, it must establish that the DOC's rules about who can send books to incarcerated people likely violate its First or Fourteenth Amendment rights. The Court will first address the likelihood of success on each of these claims before turning to the remaining *Dataphase* factors.

### A. Likelihood of Success on the Merits – First Amendment

HRDC argues that the DOC's policies violate its First Amendment rights to communicate with prisoners. "To determine whether a jail policy violates the First Amendment rights of an entity seeking to communicate with inmates," a court must examine "whether the challenged policy is reasonably related to legitimate penological interests." *Human Rts. Def. Ctr. v. Baxter Cnty., Ark.* (*Baxter II*), 129 F.4th 498, 503 (8th Cir. 2025) (internal quotation marks omitted). The analysis is guided by four considerations, often referred to as the *Turner* factors. *Id.*; *see also Turner v. Safley*, 482 U.S. 78 (1987).

> (1) whether the policy has a valid rational connection to a legitimate governmental interest;
>
> (2) whether alternative means are open to those desiring to communicate with inmates to exercise the asserted right;
>
> (3) what impact an accommodation of the right would have on guards and inmates and prison resources; and
>
> (4) whether there are ready alternatives to the policy.

*Baxter II*, 129 F.4th at 504. The burden of persuasion is not on the Defendants to prove the validity of its policy, but on the party challenging the policy (in this case, HRDC) to

disprove the validity of its policy. *Hum. Rts. Def. Ctr. v. Baxter Cnty., Ark.* (*Baxter I*), 999 F.3d 1160, 1164 (8th Cir. 2021).

### 1. *Turner* Factor One: Valid Rational Connection

For the first *Turner* factor, the Court must examine whether there is a rational connection between the DOC's policy and a legitimate government interest. *Turner*, 482 U.S. at 89. Under this factor, "the governmental objective must be a legitimate and neutral one." *Id.* at 90. The DOC identifies the government interest as preventing inmates and prison staff from being exposed to drugs.

The DOC's policy of not allowing books from non-approved vendors is clearly connected to the government interest identified by the DOC. But the way that the DOC implemented its policy of approving vendors was not rationally related to its articulated legitimate penological objectives, and Defendants have not yet provided guidelines that will ensure the DOC will enforce the policies consistently prospectively.

As an initial matter, the Court concludes that the 2024 implementation of the DOC's mail policy was not content neutral. When first implementing the policy, the DOC, without any application process at all, approved general interest publishers but not HRDC—which specializes in speech regarding the rights of incarcerated individuals. Moreover, although the DOC has indicated that its intent was to select publishers that do not use third-party order fulfillment services (Brakke Decl. ¶ 12), the DOC did not approve HRDC, which does use direct party fulfillment (Second Decl. of Paul Wright ("Second Wright Decl.") ¶ 2, May 21, 2026, Docket No. 41). Moreover, the DOC initially approved

Macmillan, a general publisher, only to later discover that Macmillan used third-party fulfillment services, rather than direct order fulfillment. (*See* Brakke Decl. ¶¶ 21–22.)

Although the DOC has now updated its mail policy and indicates that it will review a "book vendor or nonprofit organization" who submits its Vendor Application Form, the DOC has not published—and Defendants have not disclosed—any guidelines that are used when reviewing applicants. While there is nothing to suggest that the reviewers are using the current policy to draw distinctions between publications based on content, there are also no guidelines in place to prevent the reviewers from drawing distinctions between publications based on content.[6] The Court concludes that HRDC has met its burden of showing that the DOC's mail policy, even as currently implemented, is not content neutral, and therefore not rationally related to legitimate governmental interest.

### 2. *Turner* Factor Two: Alternative Means

With respect to the second *Turner* factor, the parties disagree on whether HRDC has viable alternative means to communicate with DOC inmates. The DOC emphasizes that (1) HRDC can complete the Vendor Application Form or (2) inmates can access HRDC's materials that have been donated to its library system or are otherwise available

[6] The standards that Defendants say they are using (vendors are large publishers, vendors were confirmed to be legitimate, DOC had verified that the vendor would not send books that had been altered to hide drugs, and that the vendor is not using a third-party distributor) do **not** appear in the available policies. (*See* Mem. in Opp'n at 9.) While "prison administrators [may] draw distinctions between publications solely on the basis of their potential implications for prison security," *Thornburgh v. Abbott*, 490 U.S. 401, 415–16 (1989), without policies in place to direct the prison administrators, the administrators are free to draw distinctions on any basis.

through the Law Library Service for Prisoners (LLSP). HRDC argues that neither the DOC's Vendor Application Form nor the library system are functional alternatives.

**a. Vendor Application Form**

HRDC argues that the DOC's Vendor Application Form is overly burdensome and bears no relationship to Defendants' purported penological objectives. The Court agrees.

If Defendants' objective is to identify vendors that use direct order fulfillment services—as opposed to third-party fulfillment services, the following question on the Vendor Application Form is not relevant:

> Do you currently provide books or other material to other correctional facilities? If so, list them.

(Vendor Application Form at 2.) Even if Defendants' objective is to identify vendors who have previously been denied permission to mail material to a correctional facility because the facility identified drugs in their materials, the following questions on the Vendor Application Form is overly broad:

> Has your organization ever been denied permission to mail books or other material to a correctional facility, had permission revoked, or otherwise been removed from a correctional facility's list of authorized vendors? If so, provide full details, including contact information for those facilities.

(*Id.*)

HRDC has demonstrated that filling out the Vendor Application Form in its current form would be quite burdensome. (*See* First Wright Decl. ¶ 12 (noting that since 1990, HRDC has sent its publications to more than 3,000 correctional facilities across the United

States); *see also id.* ¶ 38 (noting the small size of HRDC's legal team and that HRDC's materials have been censored by multiple prisons).) But the Court is also mindful that HRDC has not shown that its application would be rejected. The fact that HRDC did not submit a Vendor Application Form—even a Form in which it had skipped the questions it identifies as unduly burdensome—suggests to the Court that HRDC was more interested in pursuing this litigation that in ensuring its materials reached DOC inmates.[7] Nevertheless, the Court concludes that the DOC's Vendor Application Form is not a functional alternative to HRDC's materials being delivered to inmates.

**b. Library System**

The Court also concludes that the DOC's Library System is not a reasonable alternative to providing DOC inmates access to at least some of HRDC's books. First, there is uncertainty that HRDC's materials will be accepted by the library, and in addition, there is a high likelihood that even materials found in the library may be damaged. (*See* Second Wright Decl. ¶ 3.) Moreover, many of HRDC's books are lengthy, which makes them ill-suited to photocopying or quick reading. (*See id.* ¶ 4.)

While the library provides an alternative means of access to some of HRDC's books (for example, those which are part of the library's Core Collection), not all books would necessarily be available to DOC prisoners. The declaration evidence shows that not all

---

[7] The Court also notes that HRDC made no effort to contact the DOC to ask to be added to the approved vendor list after Book Vendor Updates Memo was released—unlike several other outside vendors. (*See* Berts Decl. ¶ 20.)

books would be accepted by all libraries as donations, and the restrictions on copying would limit access as well. For these reasons, the Court concludes that neither the DOC's Vendor Application Form nor the library system are functional alternatives that would allow all inmates access to all of HRDC's books.

### 3. *Turner* Factor Three: Significant Burden

The third *Turner* factor requires the Court to consider the impact an "accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. HRDC argues that the DOC accepting HRDC's publications (presumably without first making it apply to be an approved vendor) would not impose a significant burden on the DOC.

Here, the balance weighs in favor of the DOC. If the DOC allowed inmates to receive publications from HRDC, it would have to allow inmates to receive publications from any unapproved vendor. But the DOC has demonstrated that requiring it to allow prisoners to order books from any non-approved vendor would undermine the safety and security of DOC facilities statewide. Allowing any vendor to exercise its rights to communicate with prisoners occurs "only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike." *Id.* at 92. And the Court must consider these possible "ripple effect[s]". . . because exercise of the right affects the inmates and staff of more than one institution." *Id*.

As the Supreme Court stated in *Turner*, "[w]here exercise of a right requires this kind of tradeoff, . . . the choice made by corrections officials—which is, after all, a judgment peculiarly within [their] province and professional expertise—should not be lightly set aside by the courts." *Id.* at 92–93 (internal citation and quotation marks omitted).

### 4. *Turner* Factor Four: Ready Alternatives

The final *Turner* factor asks whether there are any ready alternatives to the policy. "The absence of ready alternatives is evidence of the reasonableness of a prison regulation"; however, "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.* at 90–91; *see also Baxter II*, 129 F.4th at 506. "The policy does not have to be the least restrictive alternative, but if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Simpson v. Cnty. of Cape Girardeau, Mo.*, 879 F.3d 273, 281 (8th Cir. 2018).

HRDC argues that the DOC could simply process and deliver publications mailed by HRDC to prisoners in the same way that the DOC processes and delivers publications sent by other book publishers. But this proposal is, in reality, a proposal that there be no distinction between approved and unapproved book vendors whatsoever. The DOC has shown that without the current policies in place, significantly more drugs and contraband

were present in DOC facilities. *See id.* at 282 ("The risk of contraband entering the facility alone is more than a *de minimis* cost and returning to [the previous] policy would force [the defendant] to incur that cost.")

HRDC also argues that the Defendants could screen books in the same way they screen other publications. But Defendants have maintained that it "is not possible or practical for staff to test every section of every page of every piece of mail or book that is sent to incarcerated individuals." (Mem. in Opp'n at 5 (citing Brakke Decl. ¶ 14).) In any event, given the sheer number of pages in many books, it is impossible to believe that screening all books (not just HRDC's) like other mail would come at a de minimis cost that would not affect other operations.

The Court considers that the "jail officials are better positioned to understand the institutional security needs of [the DOC.]" *Simpson*, 879 F.3d at 282. The Court will, therefore, defer to their judgment regarding the practicability of alternative screening processes.

### B. Likelihood of Success on the Merits – Fourteenth Amendment

HRDC also alleges that the DOC is violating its Fourteenth Amendment right to Due Process by adopting a policy without providing clear guidelines on how it will be enforced.[8] The Court concludes that HRDC is likely to succeed on this ground.

---

[8] HRDC also argues that the DOC violated its due process rights by (1) not providing notice to HRDC before its publications were rejected and returned at HRDC's expense and (2) not providing HRDC with an opportunity to appeal the rejection of its publications.

A statute or policy fails to comport with due process if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008) (discussing Fifth Amendment Due Process). While the policy itself is very clear about what is prohibited (sending books from non-approved vendors/sources), the lack of guidelines on how vendors are approved or rejected nevertheless renders the policy "so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.* Accordingly, HRDC has shown that it is likely to succeed on its Fourteenth Amendment Due Process claim.

**C. Irreparable Harm**

The violation of a First Amendment right is presumed to cause irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Under Eighth

---

With respect to HRDC's first argument—that the DOC violated its due process rights by not providing notice to HRDC before its publications were rejected and returned at HRDC's expense—the Court concludes that the "Unauthorized Vendor" return-to-sender marking provided sufficient notice to HRDC that all of its mailings were rejected for violating DOC policy. While a sender is due "some process" when a correctional facility rejects incoming mailings, "due process does not require copy by-copy notice [if] later denials of identical publications amount to the routine enforcement of a rule with general applicability." *Human Rts. Def. Ctr. v. Union Cnty., Ark.*, 111 F.4th 931, 935 (8th Cir. 2024) (alteration in original).

With respect to HRDC's second argument—that that the DOC violated HRDC's due process rights by not providing it an opportunity to appeal the rejection of its publications—the Court concludes that, as in *Union County,* "HRDC was not entitled to a formal appeal process because the organization challenged the validity of the . . . policy, not the rejection of individual mailings under that policy." *Id.* at 936.

Circuit precedent, irreparable harm exists "[i]f [the plaintiffs] are correct and their First Amendment rights have been violated." *Marcus v. Iowa Pub. Television,* 97 F.3d 1137, 1140–41 (8th Cir. 1996).

Because the Court concludes that HRDC has shown it is likely to succeed on its First Amendment claim, this factor weighs in the HRDC's favor.

**D. Balance of Equities**

HRDC argues that Defendants' injuries are minimal and speculative and that changing the current policies to allow HRDC to deliver its publications to prisoners would not be significantly costly or time consuming. But HRDC ignores the fact that if it is allowed to deliver its publications to prisoners, then presumably the DOC will have to allow all other non-approved vendors to deliver their publications also.

Because the DOC has made an adequate showing that the reversal of the DOC's policy is likely to lead to an increase in drugs and contraband entering DOC facilities, the Court finds that this factor weighs in the DOC's favor.

**E. Public Interest**

It is "always in the public interest to protect constitutional rights and the balance of equities generally favors the constitutionally-protected freedom of expression." *Rodgers*, 942 F.3d at 459 (8th Cir. 2019) (cleaned up). But there is also a strong public interest in affording the DOC discretion to implement procedures that reduce safety and

security risks to inmates and staff. The Court concludes that this factor does not weigh in either party's favor.[9]

**F. Temporary Relief**

Because the Court concludes that HRDC is likely to succeed on the merits on both its First Amendment and Fourteenth Amendment claims and there is a threat of irreparable harm to HRDC, the Court concludes that HRDC is entitled to some temporary relief. But the relief that HRDC requests—enjoining Defendants from disapproving publications published or distributed by HRDC on the ground that HRDC is not an "approved" vendor under the DOC's current policies—would mean that the DOC had to allow all publications from any vendor. Such relief would decrease the safety and security of inmates and DOC staff.

The Court will not, therefore, grant HRDC's requested relief in full. Instead, the Court will order Defendant to provide the Court with a modified Vendor Application Form, issued by the DOC, within 60 days of this Order. The modified Vendor Application Form shall no longer include questions related to whether the applicant provides books to other facilities and whether the applicant has ever been denied permission to mail books or

---

[9] Although in at least some instances the third and fourth *Dataphase* factors—balance of the harms and the public interest—merge when the Government is a party, *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1019 (8th Cir. 2023) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)), the Court concludes that here the factors are more appropriately analyzed separately because the government does not always speak for the public interest, particularly where minority rights are concerned, *see* M Devon Moore, *The Preliminary Injunction Standard: Understanding the Public Interest Factor*, 117 Mich. L. Rev. 939, 955 (2019).

other material to a correctional facility.[10] The Court will further order that the Defendants must, within 60 days of this Order, provide the Court with evidence that the DOC has developed and disseminated guidelines on the criteria to be used when deciding whether a book publisher or nonprofit will be approved or rejected. Finally, the Court will order that before seeking further relief from this Court, HRDC must submit an application, using the modified Vendor Application Form. The DOC will be directed to approve or deny HRDC's application (submitted using the modified Vendor Application Form) within 30 days of submission. If the DOC denies HRDC's application (or that of any other vendor using the modified Vendor Application Form), the Court will order Defendants to immediately advise HRDC (or the relevant vendor) and the Court of the grounds for such disapproval.

## CONCLUSION

Because the Court concludes that HRDC has demonstrated a likelihood of success on the merits and that justice requires the court to intervene, the Court will grant in part HRDC's motion for a preliminary injunction, as further outlined in the Order, below.

[10] The DOC may, if appropriate, also take this opportunity to add a question to the Book Vendor Form related to whether the applicant uses a third-party fulfillment service or only direct order fulfillment.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff Human Rights Defense Center's Motion for Preliminary Injunction (Docket No. [21]) is **GRANTED in part**, as follows:

1. Defendants must, within 60 days of this Order, provide the Court with a modified Vendor Application Form, issued by the Minnesota Department of Corrections ("DOC"). The modified Vendor Application Form shall no longer include the following questions:

    > Do you currently provide books or other material to other correctional facilities? If so, list them.
    >
    > Has your organization ever been denied permission to mail books or other material to a correctional facility, had permission revoked, or otherwise been removed from a correctional facility's list of authorized vendors? If so, provide full details, including contact information for those facilities.

2. Defendants must, within 60 days of this Order, provide the Court with evidence that the DOC has developed and disseminated guidelines on the criteria to be used when deciding whether a book publisher or nonprofit will be approved or rejected.

3. Before seeking further relief from this Court, Human Rights Defense Center ("HRDC") must submit an application, using the modified Vendor Application Form.

4. The DOC must approve or deny HRDC's application (submitted using the modified Vendor Application Form) within 30 days of submission.

5. For the sixth months following release of the modified Vendor Application Form, if the DOC denies a vendor's application submitted using the modified Vendor Application Form, Defendants must immediately advise that vendor and the Court of the grounds for such disapproval.

**The motion is DENIED in all other respects**.

DATED: August 14, 2026
at Minneapolis, Minnesota.

/s/ John R. Tunheim
JOHN R. TUNHEIM
United States District Judge